UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
UNITED STATES OF AMERICA,

                Plaintiff,                                  Index No.: 08 CR. 594 (NG)

      v.

LESTER MARQUEZ,

                Defendant.
-------------------------------------------------------------------

## SENTENCING MEMORANDUM ON
## BEHALF OF LESTER MARQUEZ

                                                        Law Offices of Scott B. Tulman &
                                                        Associates, PLLC
                                                        Attorneys for Defendant
                                                        369 Lexington Avenue, 15th Floor
                                                        New York, New York 10017
                                                        (212) 661-3080

LAW OFFICES OF
# SCOTT B. TULMAN & ASSOCIATES, PLLC

369 LEXINGTON AVENUE, 15TH FLOOR
NEW YORK, NEW YORK 10017
(212) 867-3600
TELECOPIER: (212) 867-1914

WWW.TULMANLAW.COM

VIA ECF

July 15, 2010

Honorable Nina Gershon
Senior United States District Court Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   United States v. Lester Marquez
      08 Cr. 594 (NG)

Dear Judge Gershon:

Defendant Lester Marquez respectfully submits this memorandum, along with the attached exhibits, to make certain objections to the Pre-Sentence Report ("PSR"), and to otherwise assist the Court in advance of his sentencing which is presently scheduled for July 28, 2010, at 11:00 a.m.

On September 23, 2009, Lester Marquez timely accepted responsibility for his misconduct when he entered into a plea agreement and pled guilty to a lesser included offense of Count One of a two count indictment charging him with Conspiring to Distribute Cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(B). The Count to which Marquez pled guilty carries a mandatory minimum penalty of 5 years incarceration.

We are mindful that that the Government's estimate of the advisory Sentencing Guidelines range in the Plea Agreement calls for a sentence of incarceration between 188-235 months and that the Department of Probation's calculations are the same. Giving all due respect and consideration to the Advisory Guidelines calculations as a factor in the sentencing determination, we submit that their application in this case fails to take into account significant mitigating factors that play no role in the guidelines analysis (which is driven primarily by the quantity of the cocaine allegedly possessed and distributed by Marquez over three years), but are very much a part of the analysis required by § 3553(a) of Title 18.

For all of the reasons set forth below, we respectfully recommend that the Court sentence Lester Marquez to a non-guidelines sentence consisting of 96 months (8 years) incarceration, with four years supervised release in the District of Puerto Rico, and a mandatory surcharge. We

also ask that the Court: (1) recommend Marquez to the Bureau of Prisons for inclusion in the 500 hour RDAP Program for appropriate treatment of the addiction problems that lead to the commission of his offense; and (2) recommend that Marquez be designated to the FCI at Miami, in the Federal Bureau of Prison's Southeast Region, if Marquez otherwise meets the requirements for admission to this facility, and if the FCI at Miami offers the RDAP program.

Such a sentence amply and harshly punishes Marquez, would provide needed medical and mental health treatment, promote the maintenance of his family relationships, and otherwise would be a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of sentencing, as required by 18 U.S.C. §3553(a).

I.  **Legal Principles Governing Sentencing – In General**

We presume the Court's familiarity with the legal principles governing sentencing and are confident the Court will make an individualized assessment of Marquez, give the advisory guidelines the respect and consideration they deserve, and adhere to the "overarching" directive of Title 18 U.S.C. Section 3553(a) that the Court consider all of the 3553(a) factors and impose a sentence not greater than necessary to accomplish the goals of sentencing. See Gall v. United States, 128 S.Ct. 586 (2007); Kimbrough v. United States, 128 S.Ct. 558 (2007); United States v. Booker, 543 U.S. 220 (2005).

In Gall, the Supreme Court provided considerable guidance for District Judges involved in the unenviable task of imposing sentences. In the district court, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" in deciding what sentence to impose. 128 S.Ct. at 596. However, a District Judge "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment on the facts presented." Id. at 596-97 (emphasis added). And the Supreme Court has specifically ruled that, in balancing the § 3553(a) factors, a judge may determine that, "in the particular case, a within Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing." Kimbrough, 128 S.Ct. at 564. A District Judge may now vary from the applicable guideline range "based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 128 S.Ct. at 570. Quoting from the Supreme Court's earlier opinion in Koon v. United States, 518 U.S. 81, 113 (1996), Justice Stevens in Gall wrote that "in the federal judicial tradition[,] ... the sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 128 S.Ct. at 598.

As the Second Circuit has stated:

> "[B]ased on the unique facts of a particular case, austere adherence to the averages and generalities of the Guidelines can be unjust and contrary to reason.... No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula. Ultimately, in the federal sentencing scheme, it is the sentencing judge who plays the primary role in determining an appropriate sentence. The appellate court's role is a secondary one and the determination of the district court is entitled to great weight under a "deferential abuse of discretion standard." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008).

In making its individualized assessment, and exercising is enhanced sentencing discretion, the District Court must contemplate, in addition to the Guidelines, consider and give appropriate weight to the following factors laid out in 18 U.S.C. § 3553(a):

(A)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(B)  the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant;

(C)  the kinds of sentences available;

(D)  the applicable sentencing guideline range and Sentencing Commission policy statements;

(E)  the need to avoid unwarranted sentencing disparities among defendants who have been found guilty of similar conduct; and,

(F)  the need to provide restitution to any victims of the offense.

The "overarching" command of § 3553(a) is the "Parsimony Clause", which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough, 128 S.Ct. at 563 (quoting Gall, 128 S.Ct. at 600).

## II. The Plea Agreement and Advisory Guidelines

We begin with the Sentencing Guidelines analysis, as the Supreme Court and Second Circuit instruct, but respectfully remind the Court that the Guidelines, "formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." Kimbrough, 128 S. Ct. at 564; see also Gall, 128 S. Ct. at 602 (same). The judge "may not presume that the Guidelines range is reasonable," and District Court Judges now must consider and respond to arguments that the guideline sentence itself reflects an unsound judgment because it fails properly to reflect § 3553(a) considerations or does not treat defendant characteristics in the proper way. Rita, 127 S. Ct. at 2465, 2468; Gall, 128 S. Ct. at 596-97. District courts no longer are required, or permitted, to simply defer to Commission policies and Courts of appeals may not "grant greater factfinding leeway to [the Commission] than to [the] district judge." Id. at 2463.

The Plea Agreement and the PSR both calculate Marqeuz's adjusted offense level under the Guidelines as 35 and his Criminal History Category as II, creating an advisory sentencing range between 188-235 months. In his plea agreement with the Government, Marquez stipulated to these guideline calculations and we do not dispute them. For the reasons set forth below,

however, we respectfully submit that the advisory guidelines call for a sentence that overstates the severity of Marquez' prior criminal history, his role in the offense, and his offense behavior.

    A.    <u>Criminal History Category</u>

The PSR calculates Marquez's Criminal History Category at Level II by reason of 2 criminal history points Marquez received for a weapons possession conviction committed on November 2, 1994, over fifteen years ago, when Marquez was 19 years old. See PSR ¶ 38. Under the advisory guidelines, Marquez's sentence should be increased by approximately 20 months because Marquez commenced his involvement in narcotics trafficking in 2004, within a decade of the time sentence was imposed in 1995 for the 1994 offense. See § 4A1.1(b), 4A1.2(e)(2) But for this conviction, Marquez would be in Level I, notwithstanding a Youthful Offender adjudication at the age of 17 when Marquez was visiting New York, and two brushes with the law that did not result in his even being prosecuted.

We respectfully request that the Court consider the Guidelines, but nevertheless sentence Marquez as if he were a Level I offender. The prior unlawful possession of a weapon conviction was committed by Marquez with another youth when the two were teenagers, and Marquez thereafter became gainfully self-employed in the music industry and remained self employed for a period of years until his compulsive gambling disorder lead to his involvement in drug trafficking. There is not a shred of evidence in this case that Marquez was or has ever been violent, that he has ever used or threatened to use a weapon, or that his present offense conduct involved violence, or weapons possession. To the contrary, the letters written by his family members speak of a loving and devoted family member. And, Marquez, upon information and belief, has a stellar institutional record after 24 months of incarceration.

For these reasons, Marquez should not receive a 20 month sentence enhancement.

    B.    <u>Offense Level</u>

Upon information and belief, the PSR and the Government's advisory Guidelines calculations were predicated on the following calculations:

| | |
|---|---|
| Base Offense Level (2D1.1(3)) | 34 |
| (at least 15 KG but less than 50 KG of Cocaine) | |
| Plus : Adjustment for Role in the Offense | + 4 |
| Less: Acceptance of Responsibility | |
| (3E1.1(a) and (b)) | - 3 |
| | 35 |

    1. <u>As to the Base Offense Level</u>

In enacting the Anti-Drug Abuse Act of 1986, Congresses'' goal was to severely punish the "major traffickers" who were identified as the "heads or managers of the retail (drug) traffic." U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: *An Assessment of How*

*Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform,* at pp. 54-55 (2004), available at http://ussc.gov15_year.htm. The assumption was made that the greater the quantity of narcotics involved in the charged offense, the greater the culpability of the charged offender. Accordingly, sentencing guidelines were drafted driven by drug quantity as the primary measure of culpability. No attempt was made to implement the guidelines in accordance with empirical data or data on past sentencing practices, and as a result the average time in prison for a drug offense increased by 31% between 1992 and 2001. See, The Sentencing Project, The Federal Prison Population: A Statistical Analysis, available at http://www.sentencing_project.org/pdfs/federalprison.pdf. District Courts have recognized, in fashioning non-guideline sentences in narcotics prosecutions that because the Sentencing Commission "departed from the empirical approach when setting the Guidelines range for drug offenses and chose instead to key the Guidelines to statutory mandatory minimum sentences that Congress established for such crimes" that "sentences in drug cases have since increased far above pre-guideline practice." United States v. Thomas, 595 F. Supp.2d 949 (E.D. Wis. 2009). See also, United States v. Cabrera, 567 F.Supp.2d 271 (D.Mass 2008)(Drug guidelines over emphasize drug quantity).

We respectfully submit that the weight driven sentencing cocaine guidelines applicable to drug trafficking offenses are flawed for many of the reasons that the crack cocaine guidelines were found to be flawed in Kimbrough. Kimbrough, was an "unremarkable" "mine-run" case in which the sentencing court found that the guidelines relating to the treatment of crack cocaine reflected unsound judgment in that they failed properly to reflect § 3553(a) considerations. The Supreme Court upheld the below guideline sentence in this ordinary crack trafficking case because it was not an abuse of discretion for the District Judge to find that the crack guidelines reflected unsound judgment in light of the purposes of sentencing and the need to avoid unwarranted disparities. The Supreme Court stated:

> "In the main," the Commission used an "empirical approach based on data about past practices, including 10,000 pre-sentence investigation reports," but it "did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses." *Id.* at 567. When a guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it "yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case."

*Id.* at 575.

We do not argue for a categorical rejection of the weight driven sentencing guidelines in the context of drug trafficking cases, since drug quantity is obviously a relevant fact indetermining the severity of the offense. We do argue, however, that weight alone is not and should not be the dispositive factor in determining an appropriate sentence because the guidelines fail to consider the relationship between the length of the distribution period and the quantity distributed, and reliance on the Guidelines alone therefore can lead, as they do in the case at bar, to an inflated, unwarranted sentence that would be at odds with § 3553(a). See United States v. Genao, 831 F.Supp. 246 (S.D.N.Y. 1993).

Common sense dictates the conclusion that, all other things being equal (as they never are), a mid-level cocaine distributor should be punished more harshly than a low level dealer, but less harshly than a high-level cocaine distributor. In this case, we do not dispute the Guidelines calculations, to the extent that they are premised on the drug quantity of 33 kilograms of cocaine distributed over a three year time period, even though the Government actually seized only six kilograms of cocaine in this case pursuant to its investigation which only began in 2006. We do respectfully submit, however, that there is a difference in culpability between a major trafficker involved in one transaction involving 33 kilograms of cocaine, and an individual like Marquez who engages primarily in 2 kilogram transactions over a period of years to total 33 kilograms. An individual prosecuted for negotiating one cocaine transaction involving 33 kilograms of cocaine is clearly part of a high-level drug trafficking organization. An individual like Marquez involved in 1-2 kilogram shipments over a period of years is a mid-level distributor and a sentence should be fashioned recognizing that fact. We dispute the claim in the PSR that Marquez was part of a "large scale cocaine distribution organization" and respectfully submit that he and his co-defendants Wagner Lopez and Kaybe Cosme were mid-level, relatively unsophisticated distributors. See PSR ¶ 16.

2.  As to the Role Enhancment

The PSR reports that Marquez shipped cocaine via Express Mail to JFK and that the co-defendants Cosme, Poupart and others would receive the packages and turn them over to the co-defendant Wagner Lopez for distribution. The PSR concludes that Marquez should be given a 4 point upward role adjustment. The PSR's conclusion is predicated on information received from the Government which, in turn, is predicated on information received from Kaybe Cosme and Wagner Lopez, both of whom cooperated with the Government on information and belief.

Contrary to the PSR, and Cosme and Lopez's claims, it was not Marquez who approached the co-defendant Kaybe Cosme, but Kaybe Cosme who approached Marquez in Puerto Rico inquiring as to whether Marquez would agree to ship cocaine from Puerto Rico to New York through Cosme and his network of people. Contrary to the PSR, the co-defendant Wagner Lopez was not subordinate to Marquez but his equal partner. Indeed, it was Wagner Lopez, then a marijuana dealer, who implored Marquez in 2003 to use his contacts in the music industry to locate sources for cocaine because, according to Wagner, the price of cocaine in the United States was much more expensive than in Puerto Rico and money could be made if Marquez could find sources for cocaine. Marquez made inquiries, but did not agree to involve himself in cocaine trafficking until his gambling addiction coupled with his dwindling income from his music business lead him to make this enormous mistake for which he will now pay dearly. Marquez did not directly control or supervise Cosme and Lopez; instead the three bore equal responsibility for organizing their joint activity in establishing a "route" for cocaine to be shipped from Puerto Rico to New York. Indeed, the PSR itself points out that it was Cosme who recruited individuals to accept packages on behalf of the conspiracy, but no role adjustment was given to Cosme. The only individual recruited by Marquez was the co-defendant Michael Poupart, and initially Poupart was hired to do carpentry work, not to act as the recipient of cocaine in New York. See PSR ¶ 20.

The conspiracy in this case was not a large scale distribution network, but rather one in which Marquez located sources of cocaine and sent the cocaine to New York, Wagner Lopez had the customers in New York and placed the orders with Marquez, and Kaybe Cosme received and arranged for others to receive the cocaine in New York. A 4 point role adjustment under these circumstances does not seem to be fair or appropriate since such an adjustment results in a sentence that inflates, we submit, Marquez' culpability when compared to the conduct of his co-defendants..

### III. Analysis Under 18 U.S.C. § 3553(a)

#### A. The Nature and Circumstances of the Offense

Section 3553 (a)(6) instructs courts to consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).

Marquez was a middle-man in a mid-level cocaine distribution conspiracy involving the distribution of approximately 33 kilograms of cocaine over a three year period. Although the Government seized only 6 kilograms of cocaine in the course of its investigation, Marquez voluntarily admitted to a greater amount because he wishes to "come clean," fully accept responsibility for his gross error in judgment, and go on from here to return to his family and thereafter lead a law abiding and productive life. He made a major mistake, agreeing to work with Wagner Lopez and Kaybe Cosme to use Cosme's route to supply cocaine to Lopez' customers. Marquez has no one but himself to blame for the circumstances in which he finds himself.
His offense behavior is deserving of severe punishment. An eight year term of incarceration for an individual who never served a substantial term of incarceration is such a severe punishment.

#### B. Marquez' History and Characteristics

Section 3553 (a)(6) instructs courts to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Lester Marquez is a 35 year old citizen of the United States, who resided his entire life in Puerto Rico. If the defense recommendation of eight years incarceration is imposed, Marquez will be released from custody when he is approximately 41 years of age, and he will be in his mid- 40's when he completes his term of supervised release. Marquez' age[1] makes it less likely that he will recidivate because "(r)ecidivism rates decline relatively consistently as age increases from 35.5% under age 21 to 9.5% over age of 50. See, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, available at www.ussc.gov/publicat/Recidivism_general.pdf.,at p. 12.

---

[1] Marquez already has been in custody for two years. Thus, the recommended sentence would require that he serve an additional six years of incarceration, after suffering from the onerous conditions of maximum security confinement at the MDC in Brooklyn.

Marquez is a quiet, soft-spoken and patient man who is exceedingly polite and extraordinarily appreciative of all efforts made on his behalf. He has an excellent relationship with his family members and with me. There is no question in my mind that Marquez has the capacity to learn from his mistakes and I believe that the substantial term of incarceration that Marquez faces will have its desired effect of reforming him and deterring him from future criminal conduct. Notably, Marquez has never had to serve a term of extended incarceration.

Marquez has no history of violence, no substantial prior criminal history, and poses little risk of recidivistic behavior because he has a strong family support system (particularly that of his sister Norka, a career army officer – See PSR ¶ 54), has been a devoted father, and was gainfully employed his entire life until his compulsive gambling addiction (which began in 1998) lead him to commit the charged narcotics offense after he maxed out his credit lines and the dwindling income form his legitimate recording business could not meet his compulsive gambling needs. See PSR ¶ 56, 65. It has been held that a compulsive gambling disorder which drives an individual to engage in unlawful activity is a mitigating fact that should be taken into consideration when determining an appropriate sentence. See, United States v. Liu, 267 F.Supp. 371 (E.D.N.Y. 2003); United States v. Iaconetti, 59 F.Supp.2d 139 (D.Mass. 1999)(11 level departure in narcotics prosecution because defendant agreed to engage in activity at suggestion of loan shark in order to extinguish gambling debts after defendant was unable to pay debts from personal resources).

A significant and unusual fact in this case involves the extraordinary remorse and guilt that Marquez must live with as a result of his offense. Marquez enjoyed a particularly close relationship with his mother and was a doting son. As the Court is aware, Marquez' mother was arrested and prosecuted because Marquez and Lopez caused packages of cocaine to be shipped to her in New York. Thereafter, Marquez's mother remained in custody for many, many months while suffering from kidney failure. Released on humanitarian grounds on account of her medical condition, Marquez' mother passed away this past January. Marquez never had the chance to apologize to his mother or to attend her funeral. As a result of his involving his mother in the instant offense, Marquez must forever live with the guilt, remorse and anguish he feels for causing his mother to suffer so in the final years of her life. This extraordinary personal guilt and anguish is a factor not taken into consideration by the advisory guidelines. See, United States v. Monaco, 23 F.3d 793 (3d Cir. 1994)(Downward departure appropriate where defendant suffered "a great deal more anguish and remorse than is typical" because he involved his son in the charged fraudulent scheme).

While incarcerated, Marquez has taken steps to learn a trade enabling him to seek and remain gainfully employed upon his release from custody. (See Attached Certificate). Upon information and belief, defendant has an excellent institutional record and has no marks against him notwithstanding the twenty five months that he has been a pre-trial detainee. This is yet another indication that Marquez is capable of leading a law abiding and productive life and is prepared to take steps, even under the difficult circumstances of his present incarceration, to better himself.

The attached letters confirm the PSR's finding that Marquez has strong family support and enjoys a close relationship with his children. As the Second Circuit has held, "the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom," United States v. Johnson, 964 F.2d 124 (2d Cir. 1992). In keeping with this principle, it was well settled in this Circuit prior to Booker that, "(a)mong the permissible justifications for downward departure . . . is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties." United States v. Milikowsky, 65 F.3d 4, 8 (2d Cir. 1995); United States v. Galante, 111 F.3d 1029 (2d Cir. 1997)(affirming downward departure in drug case from 46-47 months to 8 days where Defendant showed he was a conscientious and caring father of two sons who would face severe financial hardship as a result of Defendant's incarceration). See also: United States v. Joyner, 924 F.2d 454, 459-61 (2d Cir.1991) (departure affirmed where imprisonment of defendant "might well result in the destruction of an otherwise strong family unit"), United States v. Alba, 933 F.2d 1117 (2d Cir. 1991)(affirming downward departure on grounds that defendant worked two jobs to support two children, grandmother and disabled father who depended on defendant to transport him in a wheelchair); United States v. Johnson, 964 F.2d 124 (2d Cir. 1992)(affirming downward departure where defendant solely responsible for care of three young children, as well as young child of her institutionalized daughter); United States v. Rose, 885 F. Supp. 62 (E.D.N.Y. 1995)(downward departure granted where defendant assumed role of surrogate father to his cousins and contributed to household budget of grandmother who had no social security or pension); United States v. Ekwunoh, 888 F.Supp. 369, 373-374 (E.D.N.Y. 1995)(downward departure granted where defendant was sole support for three young children and oldest child had emotional problems); United States v. Handy, 752 F.Supp. 561 (E.D.N.Y. 1990)(downward departure granted where defendant was a single parent who remained continuously employed for thirteen years while raising three children and the promising future of children would be threatened by defendant's prolonged incarceration.), See also, United States v. Hawkins, 380 F.Supp.2d 143, 165 (E.D.N.Y.2005), aff'd, 228 Fed. App'x 107 (2d Cir.2007) (concluding that any incarceration "will in effect doom his.... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.")

Marquez' family circumstances should be seriously taken into account, even if they do not rise to the "extraordinary" level required to justify a departure from the Guidelines when they were mandatory, for these family circumstances constitute a mitigating factor, especially in light of the other mitigating factors in this case.

The attached letters from Marquez's family and friends leave no doubt that Marquez, despite his many personal flaws and failings, is a conscientious and devoted father, who enjoys and maintains extremely close, stable, loving, healthy relationships with others. With the exception of this one extraordinarily serious exercise of bad judgment, resulting from his compulsive addiction to gambling and his resulting financial distress, Marquez has demonstrated by his conduct over the first thirty years of his life that he was fully capable of leading a productive, law abiding life.

C.     Protection of the Public

Section 3553(a)(2)(C) instructs the Court to consider in imposing sentence the need to protect the public from future crimes the defendant might commit. As argued above, Marquez is now 35 years old and, at the earliest, will be in his mid-40's when he is no longer subject to post-release supervision. He will statistically be on the verge of presenting the least risk of recidivism. Moreover, the narcotics offenses he committed were not in any way linked to violence or the threat of violence. Thus, the protection of the public does not appear to be an overriding concern in this case. See, United States v. Luciana, 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005)("Post-Booker courts have noted that recidivism is markedly lower for older defendants); United States v. Carmona-Rodriguez, No. 04 Cr. 667 (RWS), 2005 WL 840464 (S.D.N.Y. April 11, 2005)(downward variance after considering the low probability of recidivism); Simon v. United States, 361 F.Supp.2d 35, 48 (E.D.N.Y. 2005)(same); See also, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, 28 (2004), www.ussc.gov/publicat/Recidivism_General.pdf.

D.     The Need to Avoid Unwarranted Sentence Disparities

We respectfully submit that the sentence of eight years we recommend is appropriate for a first time narcotics offender, who was not involved with any drugs other than cocaine, has never served a substantial term of incarceration, has no history of violence, and who sought to earn "easy money" to support a compulsive gambling addiction, and would not result in an unwarranted disparity in sentencing.

The co-defendant Michael Poupart, who agreed to receive packages of cocaine from Marquez in New York received a sentence of one year and one day, resulting in a term of incarceration of approximately 10 months.

The co-defendant Kaybe Cosme, who cooperated with the Government, received a sentence of time served, after serving 15 months before being released on bail.

The co-defendant Wagner Lopez, upon information and belief, has yet to be sentenced.

Under these circumstances, sentencing Marquez to a term of incarceration that is more then six times the term imposed on Cosme, and eight times more then the term imposed on Poupart seems to be fair and appropriate.

E.     To Provide the Defendant with needed mental health and medical care in the most effective manner

One of the factors required to be considered under 18 U.S.C. 3553(a)(2)(D) is the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The PSR points out that Marquez has a history of addiction to casino gambling, and that Marquez has been using marijuana and alcohol on a daily basis his entire life. PSR ¶ 56, 58. Accordingly, we respectfully request that the Court recommend Marquez for inclusion in the 500 hour RDAP program.

F.      Deter Others and Provide Just Punishment

The goals of punishment and deterrence must be balanced with the goals of rehabilitation, parsimony, and compassion. Requiring Marquez to serve eight years in prison, followed by four years of supervised release is both rehabilitative and sufficiently punitive.

In Gall, *supra,* the Supreme Court concluded that it was error for the Eighth Circuit to give no weight to the significant burdens inflicted by a term of supervised release or probation. The Court observed that probation, or supervised release without incarceration, is not an act of leniency, but rather a "substantial restriction of freedom" because probationers "may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court." Id, at 595-96. Probationers must "report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." Id. at 596.

In this case, the recommended sentence for Marquez achieves the punitive goals of sentencing and provides sufficient general and specific deterrence.

G.      The Kinds of Sentences Available

18 U.S.C. § 3553(a)(3) requires the Court to consider "the kinds of sentences available." At bar, the Court can sentence Marquez as we propose because the statute to which he pled guilty carries a five year mandatory minimum sentence.

H.      Combination of Circumstances

Even where individual circumstances do not, alone, justify a downward variance, a combination of these mitigating factors may tip the balance in favor of a downward variance. See, e.g., United States v. Rioux, 97 F.3d 648 (2d Cir. 1996)(10 level downward departure for combined health problems and good acts); United States v. Broderson, 67 F.3d 452, 458-459 (2d Cir. 1995)(combination of factors justify non-Guidelines sentence with 7 level departure including overstating of loss, seriousness of Defendant's conduct, and no personal benefit to defendant); United States v. Mateo, 299 F.Supp.2d 201 (S.D.N.Y. 2004)(9 level departure in heroin case where combination of extraordinary family circumstances and pre-sentence confinement together justified non-Guidelines sentence. Here, Marquez's combined circumstances warrants imposition of the recommended non-guideline sentence.

**IV. Conclusion**

Without seeking to excuse or minimize the gravity of Marquez's conduct, for the reasons set forth above, we respectfully submit that an eight year sentence, followed by four years of supervised release amply punishes this 35 year old with no prior narcotics convictions and no history of violence, reflects the seriousness of his offense, promotes respect for the law, affords adequate deterrence to others, and sufficiently achieves the statutory goals of sentencing. A

sentence requiring a greater term of incarceration would "work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." Gall at 599 (quoting district court opinion).

Dated: New York, New York
July 19, 2010

Respectfully submitted,

Scott B. Tulman
Attorney for Lester Marquez

To:   Thomas M. Sullivan, AUSA
United States Attorney's Office (Criminal Division)
Email: Thomas.Sullivan@usdoj.gov

SBT:ss
Enclosure